IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SHARNA BARR,

        Plaintiff,

        v.                              Civil Action No. 1:07-cv-15

MICHAEL ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

## I.  Introduction

A.    Background

      Plaintiff, Sharna Barr, (Claimant), filed her Complaint on February 2, 2007, seeking

judicial review pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) of an adverse decision

by Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his

Answer on February 20, 2007.[2]  Claimant filed her Motion for Summary Judgment on May 25,

2007.[3]  Commissioner filed his Motion for Summary Judgment on June 22, 2007.[4]

B.    The Pleadings

           1.      Claimant's Motion for Summary Judgment.

           2.      Commissioner's Motion for Summary Judgment.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 10.

[4] Docket No. 11.

C.      Recommendation

I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.      Commissioner's Motion for Summary Judgment be GRANTED because substantial evidence supports the ALJ's determination that Claimant's subjective complaints are less than fully credible.

## II.  Facts

A.      Procedural History

 Claimant filed an application for disability insurance benefits on March 31, 2004.  She filed an application for supplemental security income on February 23, 2004.  Claimant alleged disability since May 28, 2001.  The claim was denied initially and on reconsideration.  Claimant requested a hearing before an ALJ and received a hearing on November 1, 2005.  The ALJ issued a decision unfavorable to Claimant on February 3, 2006.  Claimant requested review by the Appeals Council, but it denied this request.  Claimant brought this action, which proceeded as set forth above.

Claimant previously filed an application for disability insurance benefits and supplemental security income on August 31, 2001.  An ALJ denied the claim on November 8, 2002.  Claimant did not appeal this decision.

B.      Personal History

Claimant was 31 years old on the date of the November 1, 2005 hearing before the ALJ. Claimant has a high school education.  Claimant has prior relevant work experience as a retail cashier, a grocery store cashier/stocker, and a nurse's aide.

C.     Medical History

The following medical history is relevant to the time period during which the ALJ

concluded that Claimant was not under a disability: November 8, 2002 – February 3, 2006.[5]

**Kenneth Belcher, M.D., 2/6/04, Tr. 121**
Discharge diagnoses: herpes simlpex virus type 2, meningitis/encephalitis, fibromyalgia,
depression, history of cervical cancer, bradycardia with questionable second degree AV block

**Rakesh Vohra, M.D. and Robert Beto, II, M.D., 2/5/04, Tr. 124**
Interpretation: normal internal cardiac chamber dimensions, left ventricular ejection fraction 55-
60 % without wall motion abnormality, no pericardial effusion, no intercardiac mass or thrombi

Impression: normal left ventricular systolic function, no significant valvular disease

**Thuan-Phuoung Nguyen, M.D., 2/5/04, Tr. 127**
Impression: left PICC catheter tip is in the projection of the distal SVC.

**Physical Residual Functional Capacity Assessment, 12/13/04, Tr. 148**
Exertional limitations
        Occasionally lift and/or carry 20 pounds
        Frequently lift and/or carry less than 10 pounds
        Stand and/or walk for a total of at least 2 hours in an 8 hour work day
        Sit for a total of about 6 hours in an 8 hour work day and must periodically alternate
sitting and standing to relieve pain and discomfort
        Push and/or pull: unlimited

Postural limitations
        Climbing ladders, ropes, scaffolds: never
        Climbing ramps/stairs: frequently
        Balancing, stooping, kneeling, crouching, crawling: no limitations established

Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations

---

[5] The prior benefits determination from 2002 receives res judicata effect since Claimant
did not appeal.  42 U.S.C. § 405(g); (h).  The ALJ did not re-open the prior claim in this
decision.  Hall v. Chater, 52 F.3d 518, 521 (4th Cir. 1995); McGowen v. Harris, 666 F.2d 60, 65-
66 (4th Cir. 1981).

Extreme heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation: no limitations established
Extreme cold, hazards: avoid concentrated exposure

**Tina M. Yost, Ed.D., 5/18/04, Tr. 156**
Diagnosis:
Axis I: obsessive compulsive disorder, under control with medication
Axis III: fibromyalgia, scoliosis, migraines, TMJ, by self report
Prognosis: fair

**Diego A. Ponieman, M.D., 6/10/04, Tr. 159**
Impression: fibromyalgia, anxiety disorder with panic attacks, temporomandibular joint dysfunction.  Failed medical management, status post surgery x 3, history of scoliosis, excessive fatigue, migraine headaches

**Psychiatric Review Technique, 7/8/04, Tr. 164**
Medical disposition: impairments not severe

The patient suffers from obsessive compulsive disorder under control with medication.

Functional limitation and degree of limitation
Restriction of activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, or pace: mild
Episodes of decompensation, each of extended duration: none

**Physical Residual Functional Capacity Assessment, 7/9/04, Tr. 173**
Exertional limitations
Occasionally lift and/or carry 50 pounds
Frequently lift and/or carry 25 pounds
Stand and/or walk for a total of about 6 hours in an 8 hour work day
Sit for a total of about 6 hours in an 8 hour work day
Push and/or pull: unlimited

Postural limitations: none established
Manipulative limitations: none established
Visual limitations: none established
Communicative limitations: none established

Environmental limitations
Wetness, humidity, noise, vibration, fumes, odors, dusts, gases, poor ventilation, hazards: unlimited
Extreme heat, extreme cold: avoid concentrated exposure

**Edwin J. Morris, D.O., 10/27/04, Tr. 187**

Assessment: sinusitis, acute, gastroenteritis, viral

**Edwin J. Morris, D.O., 10/23/04, Tr. 188**
Assessment: sinusitis, maxillary, chronic

**Edwin J. Morris, D.O., 10/7/04, Tr. 189**
Assessment: anemia, fatigue

**Edwin J. Morris, D.O., 9/28/04, Tr. 190**
Assessment: back pain, wart removal, depression, sinusitis, acute, temporomandibular joint syndrome or TMJ

**Edwin J. Morris, D.O., 9/23/04, Tr. 192**
Assessment: dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 9/9/04, Tr. 193**
Assessment: anemia

**Edwin J. Morris, D.O., 8/27/04, Tr. 194**
Assessment: depression

**Edwin J. Morris, D.O., 8/9/04, Tr. 195**
Assessment: anemia

**Edwin J. Morris, D.O., 7/29/04, Tr. 196**
Assessment: cervical region sprain, strain, dorsal/thoracic sprain/strain

**Edwin J. Morris, D.O., 7/8/04, Tr. 197**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain, fibromyalgia, depression

**Edwin J. Morris, D.O., 6/29/04, Tr. 198**
Assessment: contusion of the elbow

**Edwin J. Morris, D.O., 6/24/04, Tr. 199**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, temporomandibular joint syndrome or TMJ

**Edwin J. Morris, D.O., 6/16/04, Tr. 200**
Assessment: sprain of the ankle

**Edwin J. Morris, D.O., 6/10/04, Tr. 201**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 6/3/04, Tr. 202**
Assessment: lumbosacral sprain/strain, cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain

**Edwin J. Morris, D.O., 5/27/04, Tr. 203**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 5/5/04, Tr. 204**
Assessment: mastoiditis

**Edwin J. Morris, D.O., 4/28/04, Tr. 205**
Assessment: otitis, external, constipation, fibromyalgia

**Edwin J. Morris, D.O. 4/23/04, Tr. 206**
Assessment: fibromyalgia

**(Unsigned), 4/14/04, Tr. 207**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain, deficiency B12

**Edwin J. Morris, D.O., 3/18/04, Tr. 208**
Assessment: anemia

**Edwin J. Morris, D.O., 3/8/04, Tr. 209**
Assessment: sinusitis, acute

**Edwin J. Morris, D.O., 3/6/04, Tr. 210**
Assessment: dorsal strain

**Brenda M. Holcomb, PAC, 2/26/04, Tr. 211**
Assessment: hot flashes

**Edwin J. Morris, D.O., 2/12/04, Tr. 212**
Assessment: anemia

**Brenda M. Holcomb, PAC, 1/29/04, Tr. 213**
Assessment: otitis media, left headache NOS

**Edwin J. Morris, D.O., 1/21/04, Tr. 214**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 1/15/04, Tr. 215**

Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Brenda M. Holcomb, 1/8/04, Tr. 216**
Assessment: thoracic strain

**Edwin J. Morris, D.O., 12/18/03, Tr. 217**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Brenda M. Holcomb, PAC, 12/15/03, Tr. 218**
Assessment: bronchitis, acute, fibromyalgia

**Brenda M. Holcomb, PAC, 12/1/03, Tr. 219**
Assessment: fatigue

**Edwin J. Morris, D.O., 11/13/03, Tr. 220**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 10/28/03, Tr. 221**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Brenda M. Holcomb, 9/30/03, Tr. 222**
Assessment: bronchitis, asthmatic, headache, NOS

**Brenda M. Holcomb, PAC, 9/17/03, Tr. 225**
Assessment: left otitis externa

**Brenda M. Holcomb, PAC, 9/15/03, Tr. 226**
Assessment: myofascial pain syndrome, fibromyalgia, headache, migraine, nausea

**Edwin J. Morris, D.O., 9/4/03, Tr. 227**
Assessment: somatic dysfunction thoracic, tinea versicolor

**Edwin J. Morris, D.O., 8/27/03, Tr. 228**
Assessment: upper respiratory infection, somatic dysfunction cervical, somatic dysfunction thoracic

**Edwin J. Morris, D.O., 7/17/03, Tr. 229**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic, lumbar sprain/strain, somatic dysfunction lumbar, lumbosacral sprain/strain, sacroiliac sprain/strain

**Edwin J. Morris, D.O., 7/9/03, Tr. 230**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction lumbar, lumbosacral sprain/strain, sacroiliac sprain/strain

**Philip J. Chua, D.O., 6/23/03, Tr. 231**
Assessment: myofascial pain syndrome

**Philip J. Chua, D.O., 6/17/03, Tr. 232**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction lumbar

**Philip J. Chua, D.O., 6/2/03, Tr. 233**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction lumbar, anxiety disorder NOS

**Edwin J. Morris, D.O., 5/30/03, Tr. 234**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction lumbar, lumbosacral sprain/strain, sacroiliac sprain/strain, otitis externa

**J. Michael Anthony Arcure, PAC, 5/19/03, Tr. 235**
Assessment: otitis externa, somatic dysfunction lumbar, somatic dysfunction thoracic

**Philip J. Chua, D.O., 5/13/03, Tr. 236**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, myofascial pain syndrome

**Philip J. Chua, D.O., 5/7/03, Tr. 237**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain

**Philip J. Chua, D.O., 4/29/03, Tr. 238**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction lumbar, headache, migraine

**Philip J. Chua, D.O., 4/16/03, Tr. 240**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction lumbar

**Philip J. Chua, D.O., 4/3/03, Tr. 241**

Assessment: sprain of the foot, abrasion of the skin

**Philip J. Chua, D.O., 4/3/03, Tr. 242**
Assessment: sprain of the right foot

**Philip J. Chua, D.O., 3/25/03, Tr. 243**
Assessment: cervical region sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, dorsal/thoracic sprain/strain

**J. Michael Anthony Arcure, PAC, 3/18/03, Tr. 245**
Assessment: otitis media, anxiety

**J. Michael Anthony Arcure, PAC, 3/18/03, Tr. 247**
Assessment: otitis media, anxiety

**Philip J. Chua, D.O., 3/3/03, Tr. 248**
Assessment: somatic dysfunction cervical, somatic dysfunction lumbar, somatic dysfunction thoracic, dorsal/thoracic sprain/strain, cervical region sprain/strain, lumbar sprain/strain, fibromyalgia

**Philip J. Chua, D.O., 2/21/03, Tr. 249**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, somatic dysfunction cervical, somatic dysfunction thoracic, somatic dysfunction lumbar, myofascial syndrome

**Psychiatric Review Technique, 1/7/05, Tr. 251**
Medical disposition: impairment not severe

The patient suffers from OCD, under control with medication

Functional limitation and degree of limitation
 Restriction on activities of daily living, difficulties in maintaining social functioning, difficulties in maintaining concentration, persistence, and pace: mild
 Episodes of decompensation, each of extended duration: none

**Charles J. Mihelic, 6/18/05, Tr. 274**
Impression: colon diverticulosis without diverticulitis

**Edwin J. Morris, D.O., 10/5/05, Tr. 295**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, costochondritis

**Edwin J. Morris, D.O., 9/26/05, Tr. 296**
Assessment: somatic dysfunction of the upper extremity, sinusitis, acute, bronchitis

**Larry L. Fitzwater, PAC, 9/7/05, Tr. 297**
Assessment: irritable bowel syndrome, lumbar sprain/strain, cervical region sprain/strain, anxiety syndrome

**Larry L. Fitzwater, PAC, 8/19/05, Tr. 298**
Assessment: sinusitis, acute, bronchitis

**Edwin J. Morris, D.O., 8/12/05, Tr. 299**
Assessment: anemia, macrocytic

**Edwin J. Morris, D.O., 8/2/05, Tr. 301**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Larry L. Fitzwater, PAC, 7/29/05, Tr. 302**
Assessment: dizziness, anemia, anxiety syndrome, polyuria, polydipsia, fatigue

**Edwin J. Morris, D.O., 7/20/05, Tr. 304**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Larry L. Fitzwater, PAC, 6/17/05, Tr. 305**
Assessment: cystitis, acute

**Edwin J. Morris, D.O., 6/15/05, Tr. 306**
Assessment: anemia

**Larry L. Fitzwater, PAC, 5/20/05, Tr. 307**
Assessment: pharyngitis

**Edwin J. Morris, D.O., 5/6/05, Tr. 308**
Assessment: dorsal/thoracic sprain/strain, lumbar sprain/strain, cervical region sprain/strain

**Edwin J. Morris, D.O., 4/26/05, Tr. 309**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 4/21/05, Tr. 310**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain

**Edwin J. Morris, D.O., 4/14/05, Tr. 311**
Assessment: anemia

**Edwin J. Morris, D.O., 3/22/05, Tr. 312**
Assessment: lumbar sprain/strain, lumbosacral sprain/strain, fibromyalgia, cervical region sprain/strain, dorsal/thoracic sprain/strain

**Larry L. Fitzwater, PAC, 3/17/05, Tr. 313**
Assessment: pain, ear

**Edwin J. Morris, D.O., 3/1/05, Tr. 314**
Assessment: cervical region sprain/strain

**Edwin J. Morris, D.O., 2/22/05, Tr. 315**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, cephalgia

**Larry L. Fitzwater, PAC, 2/8/05, Tr. 316**
Assessment: sinusitis, acute, bronchitis

**Edwin J. Morris, D.O., 1/3/05, Tr. 317**
Assessment: bronchitis, sinusitis, acute, cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain, fibromyalgia

**Edwin J. Morris, D.O., 12/21/04, Tr. 318**
Assessment: fatigue

**Edwin J. Morris, D.O., 12/8/04, Tr. 319**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, anxiety syndrome, infection, skin

**Edwin J. Morris, D.O., 12/1/04, Tr. 320**
Assessment: cervical region sprain/strain, dorsal/thoracic sprain/strain, lumbar sprain/strain, lumbosacral sprain/strain, fibromyalgia, confusion–secondary to fibromyaglia

**Larry L. Fitzwater, PAC, 11/23/04, Tr. 321**
Assessment: gastroenteritis, anxiety syndrome, rash fungal

**Larry L. Fitzwater, PAC, 11/16/04, Tr. 323**
Assessment: otitis, external, sinusitis, acute, anxiety syndrome

**Sandra Cunningham, D.C., 8/18/05, Tr. 348**
Clinical impression: the patient has cervical, thoracic, lumbar, and pelvic segmental dysfunction resulting in pain complicated by mm rigidity and overactivity, as well as fibromyalgia with complication factor of degenerative disc disease in the cervical spine

**Joseph Migaiolo, M.D., 9/29/05, Tr. 362**
Impression: disc space narrowing at C5-C6

**Bryan K. Hosler, D.C., 10/5/05, Tr. 375**

Conclusion: moderate discogenic spondylosis involving C5-6, cervical arcual kyphosis accompanied by altered spinal biomechanics, mild multi-segmental thoracic discogenic spondylosis, mild degenerative facet atrophy involving L4-5 and L5-S1, right inferior pelvic unleveling with a compensatory left thoracolumbar spinal inclination, which is most likely related to muscle spasticity and/or intersegmental dysfunction. The possibility of a leg length discrepancy cannot be excluded.

**Brian D. Houston, M.D., 6/6/02, Tr. 378**

Assessment: fibromyalgia syndrome

**Katrina Richards, MSIV and Shanthi Manivannan, M.D., 2/9/05, Tr. 381**

Discharge diagnoses: muscle spasms in neck, complicated migraine, history of type 2 herpes simplex virus meningitis in February 2004, history of migraines, history of fibromyalgia, depression

D.      Testimonial Evidence

        Testimony was taken at the November 1, 2005 hearing. The following portions of the

testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 420)

        Q       Do you smoke?

        A       I did. I been trying to quit. I'm down to two a day.

        Q       Two of what?

        A       Two cigarettes a day.

        Q       And when did you reduce it from, what was your highest consumption?

        A       The highest was up to a pack.

        Q       And when did you reduce?

        A       I've been reducing it the past six months.

                                *               *               *

        Q       Do you have a driver's license?

12

A       Yes.

Q       How many miles do you drive a week?

A       About, depending on the week.  Sometimes I don't drive at all.  Maybe ten, ten miles, ten or 15 miles.

Q       How come you drive so few miles?

A       When I drive, my leg and my back, the right, when I push on the gas pedal - -

Q       Causes leg and back pain to drive?

A       Yes.  Yes.

*        *        *

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 426)

Q       And what did Dr. Cunningham suggest for you other than the adjustments?

A       Exercise.

Q       And - -

A       Yoga.  I can't do yoga.  I tried.  Every time I did the one dog position or over - -

Q       Uh-huh.

A       I, it always hurt.  It made me go into a flare.  So I do regular exercises.

Q       And then somebody give those exercises to you?

A       Yes.

Q       Who gave them to you?

A       She gave me some.

Q       And what do they consist of?

A       Of moving my arm like this, stretching - -

Q        You're kind of stretching your arm out across the front of your body?

A        Yeah.  Yeah.  And then pulling back to release those muscles.

Q        Okay.  And are they mostly stretching exercises?

A        Stretching exercises and bending at the table like that, but I can't get all the way down today.

Q        Okay.  And how often do you do those?

A        I do them at least, try, to make it, I'm supposed to do them 30 minutes a day.  And I'll exercise, it might be ten minutes at one period and then I rest and then another ten.

Q        So, do you generally get the 30 minutes in?

A        Sometimes I don't, no, not generally.

Q        Okay.  So how, do you usually get at least one ten minute session in?

A        Uh-huh.

Q        What about two?

A        On a basis, yeah.

Q        Okay.  But it's difficult for the three?

A        Yeah.

Q        Okay.  And the doctor that you're seeing now, the chiropractor you're seeing now, does he also recommend these types of exercises?

A        Yes.

Q        Has he given you anything else for you to do?

A        Rotation of my neck, pushing, doing a forward motion, pushing and the backward, all range of motion, the exercises of putting my arms against  the wall and bringing

them into my, and, for my pecks.

*          *          *

Q    Have your doctors recommended that you walk?

A    Yes.

Q    And are you doing that?

A    I may be able to walk one day, like a half a mile up to a mile and the next day I can't.  There may be days I can do it two day, two times in a, two days, and then, I can't.  I pay for it.

Q    So on average, let's say an average week, how many days do you walk?

A    One right now.

Q    And what about when the weather was better?  Is the weather a factor in the - -

A    The weather's a definite factor.

Q    Okay.  I'm sorry.  How, when the weather was good, how many days a week were you able to walk?

A    Two.

Q    Okay.

A    As it gets colder, I won't be able to walk.  I couldn't even take my daughter trick-or-treating last night.  My husband did.  It was too cold.

Q    What does the cold have to do with it?

A    The cold just makes me, it, to my best knowledge to explain it is the cold just, it just, it's like arthritis.  It makes me just kind of curl up.  I just, I hurt all over like a flu feeling.  I feel like I got the flu.

Q       Now, I want to talk to you some about how you spend your time during the day. What time, generally, do you go to bed at night?

A       About 9:00.

Q       And are you able to go to sleep right away?

A       No.

Q       And what time is it before you go to sleep?

A       About 11:00.  That's usually when I take the Xanax.

Q       And with your medicine, are you able to sleep all through the night?

A       Yes.

Q       And what time do you get up in the morning?

A       6:30.

Q       And what do you do in the morning?

A       On a good day, I get my daughter dressed to go to school.  And - -

Q       Do you take her to school?

A       No.

Q       How does she get to school?

A       She rides the bus.

Q       Okay.  And does the bus pick up at the house or do you have to walk her somewhere?

A       She walks down to the end of the road.  She's 9 and - -

Q       Okay.

A    And there's been lots of days that my husband has been late for work by if he had to take her or get her ready or - -

Q    Okay.  So on a good day, you're able to get up and get your daughter off to school.   And then on a good day, what do you do with the rest of your morning?

A    Like the night before, he'll carry the laundry down and do it, fold clothes.

Q    Do you, are you able to do any of the other housework on a good day?

A    On a good day, the dishes.

Q    Do you cook?

A    Yeah.

Q    So on a good day, are you generally able to be up and doing things most of the day?

A    Yeah, but I got to sit down.  I've got to take breaks.  When, even on a good day, I've got to sit down and take a break.

Q    Okay.  How often, generally, do you take a break?

A    Between a half hour, if I'm up doing something, then I'll sit down for about ten minutes.  And on days that I'm really spasm, I've got to be walking around the house because if not, if I sit in the chair, it makes it worse.

Q    Okay.  So when you say you take a break, you're just talking about sitting down?

A    Yeah.

Q    And resting?

A    Yes.

Q    Okay.  Now what about days that aren't good days?

A       The days that aren't good days, my husband takes my child to school.  I have a hard time getting out of bed.  I, I can't explain the pain other than it, it feels like I've got, if anybody knows what, I mean, if you've had the flu, that's what I feel like.  I feel like I've had the flu.  And on those days, then I wonder again and talk to my doctor, it makes me want to not be here.  I was fine until after, after I, the only thing I can think of is after I had my hysterectomy.  I was fine until then.  I've never had to go through this.  Basically, I'm in bed with heating pads.

*              *              *

Q       Now, does your daughter participate in any kind of school activities?

A       She plays basketball.

Q       And are you able to attend her games and thing like that?

A       There's been a couple that I've attended, but mostly my husband goes.

Q       So you do any other activities?

A       No.  She's in caravan [phonetic] at church.

Q       And what's that?

A       It's like a scout program.

Q       Okay.  Are you, do you participate in that with her?

A       I've went down to church with her.  She, they go to different classes and done that.  There's been lots of times that he takes her.

Q       And do you - -

A       But then most of the times, I've had to miss church because of this.

Q       Okay.  Do you go to church regularly?

A	Yeah.

Q	How often are you able to go during the month?

A	About two times.  But I talk to my pastor all the time.

Q	In person or by phone?

A	On the phone and in person.

Q	And do you go to - - is it a woman or a man?

A	Man.

Q	Do you go to him or does he come to you?

A	He's came to my house and I went to him.

Q	Okay.  Do you go to the grocery store and go shopping and things like that?

A	On a good day I've went there, but I can't carry them back in.  My husband's there to do it.

Q	What about trips, vacations, things like that?

A	I can't do long rides or vacations.  The only thing we did was back in 2004, was that last year?

Q	Uh-huh.

A	No.  Yeah.  We went to Yochum's Vacation Land [phonetic].  He got us a cabin and that's right after I had my meningitis and I still had the pickline [phonetic] in and we stayed in that, in that cabin the whole time.

*                    *                    *

A	February - -

Q	I think the record shows '04.  Does that sound right?

A        Yeah because that would have been, we went after that.

Q        Okay.  Sharma, on your good days, do you think you'd be able to work?

A        No.  I don't.

Q        Why not?

A        I have to take breaks.  The good days, it's still, the pain's still there and I never know when I'm going to have a flare.

                    *                    *                    *

[RE-EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 442)

Q        Some of this is, goes way back because your alleged onset date is in '01, so you've got to help me out in the four years and a half since your alleged onset date.  Now, she's been in basketball how long?  How many winters?

A        Just this, just this year.

Q        Just this year.  And how many games have you gone to counting practices?

A        Counting practices?

Q        Uh-huh.

A        Four.

Q        When did basketball start, in October?

A        Yeah.

Q        And what is the church activity she does, Ms. Barr?  It's called caravan?

A        Yeah.

Q        And what does that mean?  It's an outreach program perhaps?

A        Yeah.  It's an outreach for children.

Q      For them to help others or to help them?

A      Yes.

Q      Okay.  So they go to, where would the van go typically?

A      To the senior center.

Q      Okay.  And then they work with the older people?

A      Yes.

Q      And how many times have you gone with her?

A      I've never went on one of those.

Q      Okay.   Church is twice a week.  Other, sometime, twice a month.  Sometimes you talk to the pastor.  Is it, he comes to your house did you say?

A      Yes.

Q      How many times a month does he come over?

A      This past month, he come twice, but on a average, about once.

Q      Are you going to have Thanksgiving at your house?

A      Yes.

Q      How many are coming?

A      Just my mom and grandma.

                              *              *              *

Q      Do you go, do you all go out even over these four years?

A      Going out like - -

Q      To movies, to dinner, to, I know you went on the one trip, but things like that?

A      We went and seen two movies and - -

Q       How about to the park, walk, where do you walk?

A       He's walk, over to the park.  We live [INAUDIBLE] the park.   Yeah.

Q       What's the name of the park?

A       Huff Park [phonetic].

Q       Huff Park.  And so you'll walk there occasionally?

A       Uh-huh.

                        *                   *                   *

Q       Do you have friends?

A       Yes.

Q       How many?

A       Good friends?  Two good - -

Q       Let's say good friends.

A       Two good friends.

Q       And what do you all do together, if anything?  How are they friends?

A       I have one for, that she's been my friend for ages that we talk and she's my

support.

Q       Does she come over and you go to the - -

A       Yeah.  She comes over to my house.

Q       When you do drive your ten to 15 a week, Ms. Barr, where do you go?

A       I go to Dr. Morse and usually I go to the grocery store and Minington [phonetic]

to Fairmont by myself.

                        *                   *                   *

[RE-EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 447)

Q        Sharna, you said that you were having Thanksgiving at your house?

A        Yes.

Q        Who's cooking?

A        My Mom.

Q        And will you help?

A        It depends.  Probably not.  She does it.  She always does it.  She always cooks.
My Mom always does.

*                *                *

[EXAMINATION OF VOCATIONAL EXPERT BY ALJ]  (Tr. 447)

Q        Mr. Ganoe, how would you describe the past work?

A        Past work as a nurses' aide, exertional level is medium, skill level is semi-skilled.
Work as a cashier, exertional level is light, skill level is unskilled.  And work as a
cashier/stocker, exertional level is medium, skill level is unskilled.  Work as a deli worker,
exertional level is light, skill level is unskilled.    Do you want the telemarketer job, Your Honor?

Q        Yes.

A        Telemarketer, exertional level is sedentary, skill level semi-skilled.

Q        Assume a younger individual with a high school education precluded from
performing all but sedentary work with a sit/stand option.  No hazards or temperature extremes;
no climbing; only occasional posturals, that is, unskilled and low stress defined as one and two
step processes, routine and repetitive tasks, primarily working with things rather than people,
entry level.  With those imitations, can you describe any work?

23

A        Under the sedentary level, Your Honor, surveillance monitor, 97,000 nationally,

1,900 regionally.  Addresser/stuffer position, 240,000 nationally, 2,000 regionally.  A general

sorter position, 25,000 nationally, 900 regionally.

Q        Are those jobs consistent with the DOT?

A        Yes, Your Honor.   The DOT does not describe whether or not a job has a

sit/stand option.  That's based upon my work in placing individuals.

*                *                *

[RE-EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 448):

Q        Do you lie down during the job, Ms. Barr?

A        Yes, I do.

Q        And how much did you lie down yesterday, Monday?

A        Four hours total.  I've not felt good since Friday night.

Q        Since your husband took your daughter trick-or-treating, did you hand out candy?

A        No.

Q        You just shut the door?

A        I shut, it, yeah, I was, I was in bed.

*                *                *

[RE-EXAMINATION OF VOCATIONAL EXPERT BY ALJ] (Tr. 449)

Q        If the claimant's credible, testimony is credible [INAUDIBLE] found it credible,

Mr. Ganoe, and she had to lie down four hours during the day, are those jobs, I assume,

precluded?

A        Yes, Your Honor.  They are.

24

Q       What if her concentration is impacted by pain from fibromyalgia where she cannot stay on task one-third to two-third of the day, are those jobs ruled out?

A       Yes.  They would be ruled out, Your Honor.

Q       What is the level of absenteeism in those jobs you named?

A       These are entry-type of positions, Your Honor.  Usually an employer allows an individual to miss up to two days per month.

Q       Okay.

ALJ     Ms. Carpenter?

*               *               *

[EXAMINATION OF VOCATIONAL EXPERT BY ATTORNEY]  (Tr. 449)

Q       In the types of positions that, that you have named, what, what is the requirement to be on task in these positions?

A       Usually the employer likes the individual at least 90% of the time.

Q       And in the surveillance system monitor job, in particular, is the requirement to maintain concentration any greater in that job than it is in the other two?

A       No.  Usually they have individuals that give them breaks and things like that, so - -

ATTY        I don't have any other questions, Your Honor.

E.      Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

- Cares for her personal needs and grooming (Tr. 63)

- Prepares meals including cereal and frozen foods (Tr. 83)

- Dusts furniture, mends clothes, and cares for her child (Tr. 83)

- Pays bills (Tr. 83)

- Shops for food and medication (Tr. 84)

- Watches television for five hours per day (Tr. 84)

- Listens to the radio for two hours per day (Tr. 84)

- Smokes cigarettes (Tr. 420)

- Drives ten to fifteen miles per week (Tr. 421)

- Does exercises (Tr. 427)

### III.  The Motions for Summary Judgment

A.    <u>Contentions of the Parties</u>

Claimant contends that the ALJ's decision is not supported by substantial evidence. Specifically, Claimant asserts that the ALJ improperly found Claimant's subjective symptoms less than fully credible.  The Court has construed Claimant's brief to assert several arguments in this regard.  First, Claimant argues the ALJ committed factual errors regarding the reasons for not finding Claimant's symptoms fully credible.  Second, Claimant maintains the ALJ erroneously relied on the fact that Claimant only received mental health treatment from her primary care physician since Claimant is poor and lacks health insurance.  Finally, Claimant asserts her limited activities are not inconsistent with disability, as found by a number of other courts.

Commissioner maintains that the ALJ's decision was supported by substantial evidence.

Commissioner states the ALJ properly found Claimant's subjective symptoms less than fully credible based upon a number of factors.

B.    The Standards.

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. § 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

   5. <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

   6. <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

   7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

   8. <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. <u>Social Security - Sequential Analysis</u>. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. <u>Rhoderick v. Heckler</u>, 737 F.2d 714-15 (7th Cir. 1984).

C. <u>Discussion</u>

I.

<u>Whether the ALJ Committed Factual Errors in His Credibility Analysis</u>

Claimant first contends the ALJ made factual errors in considering the credibility of her subjective symptoms. Commissioner argues the ALJ properly considered Claimant's credibility. The ALJ's findings will be upheld as long as they have substantial evidence to support them. <u>Hays</u>, 907 F.2d at 1456.

Claimant first asserts the ALJ erred in stating Claimant had the ability to independently care for the personal needs of herself and her daughter. (Tr. 21). Claimant states her testimony more accurately reflects that she can care for her personal needs and can occasionally prepare

her daughter for school.

The Court concludes substantial evidence supports the ALJ's decision in this regard. A questionnaire regarding daily activities stated Claimant required no help in caring for her personal needs and grooming. (Tr. 83). Claimant testified that on good days she has the ability to rise at 6:30 a.m., dress her daughter, and walk her to the bus stop. (Tr. 432). Claimant's testimony regarding days where her symptoms affect her in a severe fashion also gives no indication that Claimant cannot care for her own basic personal needs. (Tr. 433-34). The law allows the ALJ to consider this evidence as tending to show Claimant was not disabled. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). Claimant testified that when she wakes up in significant pain, her husband takes her daughter to school. (Tr. 433). Although the ALJ did not include this final part in his credibility determination, this does not necessarily mean he did not consider it. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998). Even if the ALJ could have spoken with greater precision, any error in this regard was minimal. Walker v. Bowen, 834 F.2d 635, 644 (7th Cir. 1987). Thus, the Court concludes substantial evidence exists.

Claimant next claims the ALJ committed a factual error in stating Claimant has the ability to "cook, clean, wash dishes, laundry, and grocery shop." (Tr. 21). Claimant states the truth is that her husband does laundry and she simply folds it. Claimant also asserts she never testified she performs cleaning. Finally, while Claimant admits she goes grocery shopping, she states her husband carries the groceries.

The Court again concludes substantial evidence exists to support the ALJ's decision. Claimant testified that she cooks and washes dishes. (Tr. 433). Although Claimant argues she never stated she cleaned, her questionnaire reveals she dusts furniture. (Tr. 83). The record also

reveals Claimant goes grocery shopping. (Tr. 84, 435). While Claimant did qualify her statement about grocery shopping by stating her husband has to carry the groceries into the house, the reality remains that Claimant can go grocery shopping and so the ALJ's statement was correct. (Tr. 21, 435). The ALJ was not required to include every detail in his opinion. Black, 143 F.3d at 386. Finally, Claimant's statement regarding the laundry is ambiguous as to whether she or her husband actually washes it. Claimant stated in a response as to what activities she performs that "he'll carry it down and do it, fold clothes." (Tr. 432). This statement could be interpreted to mean either that Claimant's husband carries the laundry and Claimant does the rest or Claimant simply folds clothes. However, even under Claimant's interpretation, folding clothes is a part of doing laundry. Any error by the ALJ was not significant. Walker, 834 F.2d at 644.

Finally, while Claimant states it is true that she attends church twice a week and goes to some of her daughter's basketball games, this is not an assignment of error. It appears to simply concede that the aspect of the ALJ's opinion mentioning this is correct.

II.

Whether the ALJ Erred in Finding Claimant Less than Fully Credible Because She Does Not Receive Mental Health Therapy, Yet Claimant Is Poor

Claimant next contends the ALJ erred in finding her less than fully credible because she does not receive mental health therapy except prescriptions from her primary care physician since Claimant is poor and has no health insurance. Commissioner contends substantial

evidence supports the ALJ's decision.

Where a person has limitations that may improve with treatment, but the person cannot afford that treatment, the ALJ may not penalize the person for a lack of means. Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir. 1986). Claimant testified she had not seen a mental health professional due to a lack of finances. (Tr. 441). Since there does not appear to be any dispute that Claimant has limited means, it was error for the ALJ to rely on Claimant's failure to seek mental health treatment as a ground for denying benefits.

Nevertheless, the Court believes this error is so small that it does not deprive the ALJ's decision of substantial evidence. The Court may affirm the decision of the ALJ where the ALJ makes small errors that do not affect the substance of the decision. Morgan v. Barnhart, 142 Fed. Appx. 716, 723 (4th Cir. 2005) (quoting Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004)). In Morgan, the Fourth Circuit stated in the Social Security context that

> While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.

Morgan, 142 Fed. Appx. at 723 (quoting Ngarurih, 371 F.3d at 190 n. 8).

The ALJ's statement that Claimant's failure to seek mental health treatment weighed against her credibility obviously had little to do with the ultimate decision. First, the ALJ properly listed several other factors as tending to show Claimant as less than fully credible. (Tr. 21). He correctly stated Claimant can care for her own personal needs. (Tr. 21, 83). Claimant has the ability to cook food, wash dishes, and go grocery shopping. (Tr. 21, 433, 435). Claimant attends her daughter's basketball games. (Tr. 21, 434). The ALJ was entitled to consider all

these factors as weighing against disability.  <u>Hunter</u>, 993 F.2d at 35.  Furthermore, the statement at issue actually came after the ALJ stated Claimant's alleged symptoms were less than fully credible.  It appears to have been more of an after thought than a primary reason for denying benefits.

The medical evidence in the record also supports this conclusion.  An examination by Dr. Yost diagnosed Claimant with obsessive compulsive disorder, but also found it was controlled by medication.  (Tr. 158).  Claimant had normal concentration, persistence, pace, and immediate memory.  (<u>Id.</u>).  Dr. Yost believed Claimant could manage her own finances.  (<u>Id.</u>).  A psychiatric review technique completed by Dr. Capage found Claimant to not have a severe mental impairment.  (Tr. 164).  Dr. Capage stated Claimant had only mild restrictions in her activities of daily living, social functioning, and concentration, persistence, and pace.  (Tr. 174). She had no episodes of decompensation lasting for an extended duration.  (<u>Id.</u>).  Another psychiatric review technique also found Claimant to only have mild limitations and to have no episodes of decompensation lasting for an extended duration.  (Tr. 261).  In spite of these findings, the ALJ assessed a moderate limitation in concentration, persistence, and pace.  (Tr. 20).

In summary, while the ALJ erred in holding Claimant's failure to seek mental health treatment against her since Claimant lacked finances for such treatment, this does not represent a material error.  The ALJ should be affirmed.

III.

<u>Whether Case Law from Other Courts Shows Claimant to Be Disabled</u>

Finally, Claimant contends other courts have found levels of ability greater that she has

are consistent with disability. Claimant cites a number of cases. Claimant contends that based on these cases certain routine, mundane activities of daily living do not show a person to lack a disability.

Although Claimant's position finds support in the cases she cites (none of which are from within the Fourth Circuit), case law within the Fourth Circuit clearly indicates such activities do go against a finding of disability. In Yost v. Barnhart, 79 Fed. Appx. 553, 555 (4th Cir. 2003), the court held that the claimant's "activities of daily living, including caring for his dogs, watching television, visiting family and friends, attending church services, driving short distances, and occasional hunting support the ALJ's" finding against disability. Likewise, in Kearse v. Massanari, 73 Fed. Appx. 601, 603 (4th Cir. 2003), the court found that the fact that the claimant could cut grass, occasionally shop, make his bed, clean the house, and cook food supported a determination against disability. District court opinions within this circuit accord with these holdings. In Goodwin v. Halter, 140 F. Supp. 2d 602, 608 (W.D.N.C. 2001), the court held that "the record before the ALJ contained substantial evidence to support a finding of inconsistency between Plaintiff's claims of inability to work and his objective ability to carry on with moderate daily activities." The court based this largely on the fact that the claimant "continued to take care of all his personal needs, do substantial household chores and yard work, do carpentry work, go fishing, drive a car, grocery shop, and visit family and friends." Id. Finally, it should be noted that Magistrate Judge Kaull from this district has held that the fact that a claimant "lived alone, cooked, did dishes, watched television, [and] read the newspapers" supported a finding that the pain the claimant alleged was not credible. Smith v. Barnhart, 2005 U.S. Dist. LEXIS 42836, at *52-53 (N.D. W. Va. Sept. 12, 2005).

Thus, the ALJ did not err in considering Claimant's every day activities as going against the disability alleged. The ALJ should be affirmed.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be DENIED.

2.      Commissioner's Motion for Summary Judgment be GRANTED because substantial evidence supports the ALJ's determination that Claimant's subjective complaints are less than fully credible.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

DATED: August 21, 2007

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE
